UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

JEFFREY ALLEN KAISER,

     Defendant-Movant,

v.

UNITED STATES OF AMERICA,

     Plaintiff-Respondent.

_____/

Case No. 1:23-cv-1292

Honorable Paul L. Maloney

## OPINION AND ORDER

Currently pending before the Court is Defendant-Movant Jeffrey Allen Kaiser ("Defendant")'s *pro se* motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. (ECF No. 1.) For the reasons set forth below, Defendant's motion will be denied.

## I.    Background

On October 28, 2020, a grand jury returned an Indictment charging Defendant with two counts of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), and one count of being a felon in possession of ammunition, in violation of 18 U.S.C. § 922(g)(1). *See* Indictment, *United States v. Kaiser*, No. 1:20-cr-170 (W.D. Mich.) (ECF No. 1). After Defendant's arrest, attorney Helen Nieuwenhuis was appointed to represent him.

Ultimately, following a 3-day jury trial, Defendant was found guilty of the three charges against him set forth in the Indictment. *See* Jury Verdict, *id.* (ECF No. 63). Prior to sentencing, a Probation Officer prepared Defendant's Presentence Investigation Report (PSR). *See* Am. PSR, *id.* (ECF No. 70). Notably, the PSR indicated that Defendant had at least three prior convictions for a violent felony or a serious drug offense, rendering him an armed career criminal and subject

to "an enhanced sentence under the provisions of 18 U.S.C. § 924(e)." *Id.* (ECF No. 70, PageID.391). Defendant, therefore, faced a mandatory minimum sentence of 15 years with respect to the two felon in possession of a firearm convictions. *See id.* (ECF No. 70, PageID.385). The parties appeared before the Court for Defendant's sentencing on September 27, 2021. The Court sentenced Defendant to an aggregate sentence of 228 months of incarceration, to be followed by 3 years of supervised release. *See* J., *id.* (ECF No. 75).

Defendant subsequently appealed, arguing that: (1) the Court should have given the "pattern 'addict-informant' instruction" because of a witness's prior addiction; and (2) the evidence was insufficient to allow the jury to conclude that he had possessed the firearms and ammunition. *See United States v. Kaiser*, No. 21-1611, 2022 WL 17547516, at *1 (6th Cir. Dec. 9, 2022). The United States Court of Appeals for the Sixth Circuit summarized the facts of the case as follows:

> All agree that Kaiser at one point lived at a specific home on Rowe Street in Ludington, Michigan. Several neighbors identified Kaiser as a resident of this Rowe Street home. Ludington police officers likewise had prior encounters with him there. But Kaiser indicated that his wife had kicked him out of the home a few months before the critical day in this case: August 13, 2020.

> On that day, Kaiser visited the apartment of Lance and Jennifer Peebles to attempt to collect a debt that Lance owed him. Lance and Jennifer were both home, as was an acquaintance, Jeff Young. Kaiser and Lance got into a heated debate over the money. Three of those involved have offered differing accounts about what happened next. According to Jennifer Peebles, she told Kaiser to get out of her apartment. Kaiser responded by displaying a black handgun that resembled a firearm "a police officer might carry[.]" Peebles asserted that Kaiser pointed this pistol at her and threatened to shoot her and Lance. Kaiser left without firing a shot, but not before punching Lance in the face. According to Kaiser, by contrast, he asked for money and punched Lance only after Lance shoved him. Kaiser also claimed that he held his phone (not a gun) during this altercation. Young likewise indicated that he "never seen no gun" and that Kaiser appeared to have his "black cell phone in his hand[.]"

> Where did Kaiser go next? He testified: "I start[ed] to home, or I start[ed]—I went to go check on my wife" at the Rowe Street residence. As Kaiser biked to this location, Richard Spinner drove by him in what Kaiser thought was a dangerous

manner. Spinner was traveling with his cousin, Bruce Stafford, to a home near where Kaiser was headed. By the time Spinner and Stafford got out of the car, an expletive-shouting Kaiser approached. The three began to argue. Kaiser soon pointed a black semiautomatic pistol at Spinner and said: "Do you want to die today?" Spinner called 911. Both Stafford and Jeffrey Orr (Spinner's downstairs neighbor) witnessed this encounter and saw the pistol. Another couple working nearby in their backyard, Darryl and Lana Powell, also overheard the argument and saw Kaiser with the pistol. According to Spinner, Kaiser ended the confrontation by tucking the pistol into a "black bandana" and walking across the street toward the Rowe Street home.

As it turns out, Jennifer Peebles had already called 911. After questioning Lance and Jennifer Peebles at the police station, officers obtained a warrant to search the Rowe Street home based on their belief that Kaiser lived there. The Ludington police department's equivalent of a "SWAT team" executed the warrant in light of the risks that Kaiser posed. As this team attempted to clear the house, an officer posted outside spotted Kaiser attempting to exit through the backdoor. This officer commanded Kaiser to put his hands up, but Kaiser retreated inside.

After officers arrested Kaiser and secured the home, they searched it for the black pistol. They instead discovered a .357 Magnum caliber revolver inside a cabinet near the backdoor where Kaiser had exited. Jessica Curtin's late father was the registered owner of this revolver. Curtin indicated that she had been a drug addict years in the past and had stolen the revolver from her father and given it to Kaiser in exchange for drugs. During the search, the officers also found ammunition hidden throughout the house. Near some of the ammunition located in a bedroom, they discovered pieces of mail and prescription bottles with Kaiser's name on them.

Because the police had failed to unearth the black semiautomatic pistol, another officer returned to the scene the next day to speak to neighbors and retrace Kaiser's steps. The Powells told this officer where they had seen Kaiser walking after his confrontation with Spinner. As the officer searched the identified area, he found a black Hi-Point .9mm semiautomatic pistol wrapped in a black bandana underneath a vehicle in the backyard of the Rowe Street home.

Over the next week, Kaiser made several calls to his wife from jail. In the first call, he told his wife to "go by [her] car" and check "underneath" to "make sure" that his "tools" were there. A few days later, she asked him about the "black gun" that the police had found "under" her car around the same time that he had told her to check for his tools. Kaiser retorted: "So what, they were listening to the phone conversation and fuckin' went there at the same time?" In another call, Kaiser berated his wife for telling the police that he would "hang out" at the "back of the house" where the revolver was found. He exclaimed "that didn't happen" and asked her: "You didn't tell them anything like that, did you?" When she answered that she thought she made such a statement to one of the officers, he responded: "I just said you didn't say that to anybody, are you dense or what?"

4

* * *

> Kaiser stood trial. The parties stipulated to most of the elements for these three felon-in-possession offenses. They agreed that Kaiser had at least one prior felony conviction, he knew he was a felon, and the firearms and ammunition were manufactured outside Michigan. The dispute at trial thus turned on whether Kaiser knowingly possessed the pistol, revolver, and ammunition.

> Testifying for the prosecution, Jennifer Peebles, Spinner, Stafford, Orr, and the Powells noted that they saw Kaiser with a black handgun and opined that the recovered pistol looked similar to the gun that he possessed. Jessica Curtin also recounted her revolver-for-heroin trade with Kaiser. And several officers testified about the events and their ensuing investigation of Kaiser. The government lastly introduced Kaiser's jail calls with his wife and photographs of the recovered firearms and items found during the search of the Rowe Street home.

> Testifying for the defense, Kaiser stated that he never possessed the black pistol and theorized that Lance Peebles might have planted it underneath his wife's car. He also stated that his wife had bought the revolver years ago and that he had not seen it since. He lastly claimed that he had no knowledge of the ammunition in the Rowe Street home, which he claimed not to have lived in on August 13. In addition, Young indicated that he had not seen Kaiser with a gun at the Peebles' apartment.

*Id.* at *1–3. The Sixth Circuit affirmed Defendant's convictions and sentences. *See id.* at *1.

Defendant did not petition the United States Supreme Court for a writ of certiorari.

Defendant filed his § 2255 motion (ECF No. 1) on December 11, 2023. In an order (ECF No. 4) entered that same day, the Court ordered the government to file a response. The government then moved for an order authorizing the release of information subject to the attorney-client privilege and requested additional time to file a response. (ECF No.65.) The Court granted that motion on January 24, 2024. (ECF No. 7.) The government filed an affidavit prepared by appellate counsel Steven Jaeger on February 7, 2024. (ECF No. 8.) Attorney Nieuwenhuis filed an affidavit (ECF No. 12) on March 8, 2024. The government filed its response (ECF No. 14) on April 11, 2024. Defendant filed a reply (ECF No. 18) on April 29, 2024. Defendant also filed what he refers to as three supplements (ECF Nos. 19, 20, 24) to his § 2255 motion.

In an order (ECF No. 25) entered on November 15, 2024, the Court noted that Defendant's first two supplements (ECF Nos. 19, 20) provide further argument in support of the grounds for relief raised in his § 2255 motion. Defendant's third supplement (ECF No. 24), however, sought to amend his § 2255 motion to add a claim for relief in light of the United States Supreme Court's recent decision in *Erlinger v. United States*, 602 U.S. 821 (2024). The Court granted Defendant leave to supplement his § 2255 motion to assert that claim and directed the government to file a supplemental response addressing Defendant's *Erlinger* claim. (ECF No. 25, PageID.157.) The government filed its supplemental response (ECF No. 27) on December 4, 2024.

On December 16, 2024, the Court received from Defendant a motion for an extension of time to respond to the government's supplemental response. (ECF No. 28.) In his motion, Defendant indicated that the mailroom at his current institution has experienced delays in ensuring that inmates receive their mail in a timely fashion. In an order (ECF No. 29) entered on December 18, 2024, the Court granted Defendant's motion, noting that it appeared that Defendant had not yet received a copy of the government's supplemental response as of December 10, 2024, when he dated his motion. The Court granted Defendant a 45-day extension to file a supplemental reply.

That 45-day period will expire as of February 3, 2025. On January 22, 2025, the Court received from Defendant a notice, dated January 14, 2025, indicating that mail at the Federal Correctional Institution Pekin, where Defendant is currently incarcerated, "is back logged as much as two months." (ECF No. 30, PageID.183.) Defendant states that he still has yet to receive a copy of the government's supplemental response or the Court's order granting him an extension of time. (*Id.*) Defendant recognizes that the Court cannot "do anything about the slow process of mail at his facility, but can grant him an extension of time that[']s reasonable." (*Id.*)

While the Court is sympathetic to the lengthy mail delays that Defendant has experienced, the Court will not grant a further extension of time for Defendant to file a supplemental reply. As discussed *infra*, the Court has concluded that *Erlinger* does not retroactively apply to cases on collateral review and, therefore, Defendant cannot rely upon *Erlinger* to challenge his sentencing enhancement under the Armed Career Criminal Act (ACCA). Any supplemental reply by Defendant would not change that conclusion. Accordingly, the Court will proceed to address the merits of Defendant's § 2255 motion below.

## II.    Legal Standards

### A.    Section 2255 Proceedings in General

A federal prisoner may challenge his sentence by filing in the district court where he was sentenced a motion under 28 U.S.C. § 2255. A valid § 2255 motion requires a movant to show that "the sentence was imposed in violation of the Constitution or laws of the United States, the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). Section 2255 affords relief for a claimed constitutional error only when the error had a substantial and injurious effect or influence on the proceedings. *Watson v. United States*, 165 F.3d 486, 488 (6th Cir. 1999). Non-constitutional errors generally are outside the scope of § 2255 relief, and they should afford collateral relief only when they create a "fundamental defect which inherently results in a complete miscarriage of justice, or, an error so egregious that it amounts to a violation of due process." *Id.* (internal quotation marks omitted). As a general rule, a claim not raised on direct review is procedurally defaulted and may not be raised on collateral review absent a showing of either (1) cause and actual prejudice; or (2) actual innocence. *Massaro v. United States*, 538 U.S. 500, 504 (2003); *Bousley v. United States*, 523 U.S. 614, 621–22 (1998); *United States v. Frady*, 456 U.S. 152, 167–68 (1982). A motion to vacate under § 2255 is not a substitute for direct appeal.

*United States v. Duhart*, 511 F.2d 7 (6th Cir. 1975); *DiPiazza v. United States*, 471 F.2d 719 (6th Cir. 1973).

### B.    Evidentiary Hearing

The Court must hold an evidentiary hearing to determine the issues and make findings of fact and conclusions of law "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). No hearing is required if Defendant's allegations "cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999) (quotation omitted).

### C.    Ineffective Assistance of Counsel

To establish a claim of ineffective assistance of counsel, a movant must prove that: (1) counsel's performance fell below an objective standard of reasonableness; and (2) counsel's deficient performance prejudiced the defendant in a way that led to an unreliable or fundamentally unfair outcome. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, and viewed as of the time of counsel's conduct, and judicial scrutiny of counsel's performance must be highly deferential." *Roe v. Flores-Ortega*, 528 U.S.460, 477 (2000) (internal quotation marks omitted). Counsel is not ineffective unless he or she "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. To establish prejudice, a movant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Id.* at 694; *see also United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (en banc) ("[T]he threshold issue is not whether [movant's] attorney was inadequate; rather, it is whether he was so manifestly ineffective that defeat was snatched from the hands of probable victory.").

8

The *Strickland* standard that applies to trial counsel also applies to appellate counsel. However, a criminal appellant has no constitutional right to have every non-frivolous issue raised on appeal. Rather, "'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751–52 (1983)). To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688. As the Supreme Court has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith v. Robbins*, 528 U.S. 259, 289 (2000). In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id.*

## III.    Discussion

Defendant raises the following grounds for relief in his § 2255 motion:

I.    Attorney Nieuwenhius rendered ineffective assistance by failing to call two witnesses to testify on behalf of Defendant.

II.    Attorney Nieuwenhuis rendered ineffective assistance by failing to object or challenge the ACCA sentencing enhancement.

III.    Defendant's convictions under 18 U.S.C. § 922(g)(1) are unconstitutional because § 922(g)(1) violates the Second Amendment.

IV.    Attorney Jaeger was ineffective for failing to raise Defendant's first two grounds for relief on direct appeal.

(§ 2255 Mot., ECF No. 1, PageID.5–14.) The Court has also granted Defendant leave to supplement his § 2255 motion with the following ground:

V.    Defendant's sentencing enhancement under the ACCA must be vacated in light of the Supreme Court's decision in *Erlinger*.

9

(ECF No. 24, PageID.150.)

### A.    Grounds Asserting Ineffective Assistance of Counsel

#### 1.    Ground I—Failure to Call Witnesses

As his first ground for relief, Defendant faults attorney Nieuwenhuis for failing to call Linda Kaiser and Tania Guzman as witnesses on Defendant's behalf at trial. (§ 2255 Mot., ECF No. 1, PageID.5.) Defendant contends that both of these women lived in the house where Defendant was arrested. (*Id.*) Defendant argues that attorney Nieuwenhuis and her investigator visited these witnesses several times, and that these women "were assured that they would be subpoenaed to testify" on behalf of Defendant. (*Id.*) Defendant argues that both women would have testified that Defendant "was not a resident of the house he was arrested at," and that "he had not lived there for several months prior to his arrest." (*Id.*) Defendant also suggests that Linda Kaiser would have testified that the firearms and ammunition belonged to her, not Defendant. (*Id.*) Defendant argues that attorney Nieuwenhuis never actually subpoenaed these witnesses and instead "informed Mrs. Kaiser that [neither] her nor Ms. Guzman were going to be needed." (*Id.*) In support of his claim, Defendant has attached what purports to be a letter from Linda Kaiser dated November 13, 2023. (*Id.*, PageID.6–7.)

Attorney Nieuwenhuis has addressed Defendant's claim in her affidavit. She states:

Counsel maintains that the issue of not calling the two witnesses Mr. Kaiser contends he wanted to testify had been discussed with Mr. Kaiser and he was well aware that by the time of his trial, they would not testify. That was trial strategy. Both in his motion and his attached letter signed by Linda Kaiser, [Defendant] makes mention of the fact counsel and the investigator both interviewed the proposed witnesses. Counsel and the investigator drove from Grand Rapids to Ludington to interview the witnesses in person. After reviewing all the discovery, reports, jail calls, etc., it was determined that the testimony of Linda Kaiser would be damaging to Mr. Kaiser. This decision was discussed with Mr. Kaiser and the reports, recordings, and phone calls from the jail to Linda Kaiser were the reasons why she did not testify. Her anticipated cross-examination, including prior inconsistent statements, would have been damaging to Mr. Kaiser's case. After

consultation with the investigator, we also came to the conclusion Ms. Guzman's testimony would not be helpful either.

(ECF No. 12, PageID.64–65, ¶ 8.)

"[W]hether to call a witness and how to conduct a witness['s] testimony are classic questions of trial strategy that merit *Strickland* deference." *Rayborn v. United States*, 489 F. App'x 871, 878 (6th Cir. 2012). In light of the foregoing, the Court cannot agree with Defendant that attorney Nieuwenhuis was ineffective for failing to call Linda Kaiser and Tania Guzman as witnesses for Defendant at trial. Defendant offers nothing but his own speculation to support his claim that testimony from these witnesses would have changed the outcome of his trial. Defendant's speculation is simply not sufficient to maintain his claim, particularly in light of the overwhelming evidence against him. *See Tinsley v. Million,* 399 F.3d 796, 810 (6th Cir. 2005) (affirming denial of an ineffective assistance claim based on counsel's failure to call witnesses where a petitioner did not "introduce [] affidavits or any other evidence establishing what they would have said"); *United States v. Ashimi,* 932 F.2d 643, 650 (7th Cir. 1991) ("[T]he testimony of a putative witness must generally be presented in the form of actual testimony by the witness or on affidavit; [a] defendant cannot simply state that the testimony would have been favorable, [as] self-serving speculation will not sustain an ineffective assistance claim.") (footnote omitted)); *see also United States v. Tilghman*, No. 07-cr-138-KSF, 2013 WL 4735578, at *10 (E.D. Ky. Sept. 3, 2013) (noting that "[w]hen a defendant claims that his attorney failed to call a witness at trial, he must '[a]t the very least . . . . submit sworn affidavits from each of the individuals he has identified as uncalled witnesses stating whether they were in fact available to appear at trial and able to give testimony favorable to [the] defense'" (quoting *Talley v. United States*, No. 1:00-cv-74, 2006 WL 3422997, at *10 (E.D. Tenn. Nov. 27, 2006))).

11

Accordingly, for the reasons set forth above, Defendant is not entitled to relief with respect to habeas ground I.

### 2. Ground II—Failure to Challenge ACCA Enhancement

Next, Defendant faults attorney Nieuwenhuis for failing to challenge his sentence enhancement under the ACCA. (§ 2255 Mot., ECF No. 1, PageID.9.) Specifically, Defendant contends that "Indiana burglary or any other burglary conviction does not meet the elements as defined in the definition of a crime of violence." (*Id.*) Defendant also contends that his prior conviction for aggravated battery also does not qualify as a crime of violence for purposes of the ACCA. (*Id.*)

The ACCA provides that

[i]n the case of a person who violates section 922(g) of this title and has three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony or a serious drug offense, or both, committed on occasions different from one another, such person shall be fined under this title and imprisoned not less than fifteen years, and, notwithstanding any other provision of law, the court shall not suspend the sentence of, or grant a probationary sentence to, such person with respect to the conviction under section 922(g).

*See* 18 U.S.C. § 924(e)(1). For purposes of the ACCA, the term "violent felony" is defined as

any crime punishable by imprisonment for a term exceeding one year, or any act of juvenile delinquency involving the use or carrying of a firearm, knife, or destructive device that would be punishable by imprisonment for such term if committed by an adult, that—

**(i)** has as an element the use, attempted use, or threatened use of physical force against the person of another; or

**(ii)** is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another[.]

*Id.* § 924(e)(2)(B).

As noted above, Defendant's PSR indicated that Defendant had at least three prior convictions for a violent felony or a serious drug offense, rendering him an armed career criminal

and subject to "an enhanced sentence under the provisions of 18 U.S.C. § 924(e)." *See* Am. PSR, *United States v. Kaiser*, No. 1:20-cr-170 (W.D. Mich.) (ECF No. 70, PageID.391). Specifically, the Probation Officer who prepared Defendant's PSR indicated that the following convictions qualified as violent felonies for purposes of the ACCA: (1) Defendant's 1981 conviction in Cook County, Illinois, for aggravated battery; (2) Defendant's 1984 conviction in Cook County, Illinois, for attempted murder; and (3) Defendant's 1988 conviction in Starke County, Indiana, for burglary. *Id.* (ECF No. 70, PageID.393–394).

Attorney Niuewenhuis has addressed Defendant's claim in her affidavit, stating:

Counsel researched this issue, and also had Research and Writing Specialist Celis research it as well. Unfortunately, the applicable law and Mr. Kaiser's prior record did not support a legal challenge to the application.

Specifically, counsel identified three convictions as likely ACCA predicate offenses. These convictions were the same convictions that the PSR ultimately relied on to conclude that Mr. Kaiser was an Armed Career Criminal.

First, Mr. Kaiser had an aggravated battery conviction under Illinois law in 1981. (ECF No. 69, PSR, PageID.367). The charging documents specified that Mr. Kaiser caused bodily harm while using a deadly weapon. Thus, although this offense is divisible, because he was charged under the bodily harm and deadly weapon sections of the statute, counsel determined that his conviction qualified as a violent felony under the ACCA. *See United States v. Velasco*, 465 F.3d 633, 640 (5th Cir. 2006); *United States v. Reyes*, 866 F.3d 316, 326 (5th Cir. 2017).

Second, Mr. Kaiser had an attempted murder conviction under Illinois law. (ECF No. 69, PSR, PageID.367). "Both murder and attempted murder in Illinois are categorically violent felonies under § 924(e)." *Hill v. United States*, 877 F.3d 717, 720 (7th Cir. 2017).

Third, Mr. Kaiser had a conviction for burglary under Indiana law. (ECF No. 69, PSR, PageID.368). Case law indicated that this conviction was a predicate as well.[1] *United States v. Perry*, 862 F.3d 620, 624 (7th Cir. 2017).

Because the case law for all three predicate offenses was from the Fifth and Seventh Circuit Courts of Appeals, counsel also considered arguing that these cases were wrongly decided. Ultimately, counsel concluded that there was no viable argument that these convictions were not predicate offenses under the ACCA.

Mr. Kaiser's status as an Armed Career Criminal was thoroughly discussed with him on numerous occasions. The acknowledgment of this issue was addressed in the Sentencing Memorandum (ECF No. 72) filed on behalf of Mr. Kaiser. Counsel requested the Court consider sentencing Mr. Kaiser to the mandatory minimum of 180 months, which in Mr. Kaiser's case would have been a downward variance since his applicable guidelines were 262 to 327 months.

_____

[1] In contrast, counsel concluded that Mr. Kaiser's Illinois burglary conviction would not count as a predicate under the ACCA. However, because Mr. Kaiser had three other predicate convictions, he was still an armed career criminal. The PSR ultimately agreed that the Illinois burglary was not a predicate, but this had no effect on Mr. Kaiser's sentence, as he still had three predicate convictions.

(ECF No. 12, PageID.65–67, ¶¶ 11–17.) Upon review of the record and relevant authority, the Court cannot agree with Defendant that attorney Nieuwenhuis was ineffective for failing to challenge the ACCA sentencing enhancement.

First, with respect to Defendant's Indiana burglary conviction, the United States Court of Appeals for the Seventh Circuit has set forth that the "term 'burglary' in § 924(e)(2)(B)(ii) does not encompass all burglaries, but only 'generic' burglary, which the Supreme Court has defined as 'an unlawful or unprivileged entry into, or remaining in, a building or other structure, with intent to commit a crime.'" *United States v. Perry*, 862 F.3d 620, 622 (7th Cir. 2017) (quoting *Taylor v. United States*, 495 U.S. 575, 598 (1900)). In *Perry*, the Seventh Circuit noted that "Indiana law defines burglary as 'break[ing] and enter[ing] the building or structure of another, with intent to commit a felony or theft in it.'" *Id.* (quoting Ind. Code § 35-43-2-1). The court stated:

> This definition is nearly identical to that of "generic" burglary—a congruence that led us in *United States v. Vogt*, 588 F. App'x 497 (7th Cir. 2015), to hold that Indiana burglary qualifies as a predicate "burglary" under ACCA. In fact, we held that it would be "frivolous" to contend otherwise. *Id.* at 498.

*Perry*, 862 F.3d at 622. The *Perry* court recognized that *Vogt* was non-precedential, but declined to "chart a different course," *id.*, noting that it had not located "'any case in which [Indiana's]

14

judiciary affirmed a [burglary] conviction that penalized acts' inconsistent with the generic offense of burglary.'" *Id.* at 624 (quoting *Yates v. United States*, 842 F.3d 1051, 1053 (7th Cir. 2016)).

The government has attached to its response copies of Defendant's judgment of commitment from his Indiana burglary conviction. (ECF No. 14-1.) Those documents indicated that Defendant pleaded guilty to one count of violating Indiana Code § 35-43-2-1, the same statute at issue in *Perry*. (*Id.*) Defendant provides, and the Court discerns, no reason for how, in light of *Perry*, this conviction does not qualify as a predicate offense for purposes of the ACCA. *See United States v. Erlinger*, 77 F.4th 617, 621 (7th Cir. 2023) ("We therefore see no basis to hold that the Indiana burglary statute no longer qualifies for the enhanced sentence mandated by ACCA."), *vacated and remanded on other grounds by Erlinger v. United States*, 602 U.S. 821 (2024).

Defendant also challenges the use of his prior Illinois aggravated battery conviction as a predicate offense under the ACCA. The government has provided copies of records from this conviction as well. (ECF No. 14-2.) Those records indicate that Defendant was charged with aggravated battery for shooting the victim in the chest with a handgun. (*Id.*, PageID.114.) Under Illinois law, "[a] person commits battery if he intentionally or knowingly without legal justification and by any means (1) causes bodily harm to an individual or (2) makes physical contact or an insulting or provoking nature with an individual." *See* Ill. Rev. Stat. ch. 38, ¶ 12–3(a)(1) (now codified as 720 Ill. Cons. Stat. 5/12–3(a)(1)).[1] A battery is elevated to aggravated battery if an individual "[c]auses great bodily harm or permanent disability or disfigurement." *See* 720 Ill. Cons. Stat. 5/12-3.05(a)(1). Aggravated battery also occurs when an individual discharges a firearm and "causes any injury to another person." *Id.* 5/12-3.05(e)(1).

---

[1] The State of Illinois recodified its battery statute after Defendant's conviction, "but the relevant language is essentially the same." *See Hill v. Werlinger*, 695 F.3d 644, 649 n.2 (7th Cir. 2012).

The United States Supreme Court has held that a conviction constitutes a "violent felony" for purposes of the ACCA as long as the conviction has as an element the use, attempted use, or threatened use of "force capable of causing physical pain or injury to another person." *Johnson v. United States*, 559 U.S. 133, 140 (2010). The United States Court of Appeals for the Seventh Circuit has concluded that a conviction for aggravated battery premised upon simple battery causing bodily harm is a violent felony for purposes of the ACCA. *See Hill v. Werlinger*, 695 F.3d 644, 649–50 (7th Cir. 2012); *see also United States v. Rodriguez-Gomez*, 608 F.3d 969, 973–74 (7th Cir. 2010). Here, there is no question that Defendant's aggravated battery conviction was based upon the fact that he caused physical injury to the victim by shooting the victim in the chest. Thus, Defendant's aggravated battery conviction was properly counted as a predicate offense for purposes of the ACCA.

In light of the foregoing, the Court cannot agree with Defendant that attorney Nieuwenhuis was ineffective for failing to challenge his sentencing enhancement under the ACCA. The arguments that Defendant raises are entirely meritless. Counsel is "not required to raise meritless arguments to avoid a charge of ineffective assistance of counsel." *Ludwig v. United States*, 162 F.3d 456, 459 (6th Cir. 1998); *see also Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013) (noting that "[o]mitting meritless arguments is neither professionally unreasonable nor prejudicial"). Defendant, therefore, is not entitled to relief with respect to ground II.

### 3.    Ground IV—Ineffective Assistance of Appellate Counsel

As his fourth ground for relief, Defendant contends that attorney Jaeger rendered ineffective assistance by failing to raise Defendant's first two grounds for relief on direct appeal. (§ 2255 Mot., ECF No. 1, PageID.14.) Defendant contends that these grounds were valid, but that attorney Jaeger "decided it best to go a different direction." (*Id.*) Defendant also argues that attorney Jaeger failed to file a petition for a writ of certiorari to the Supreme Court. (*Id.*)

16

In his affidavit, attorney Jaeger indicates that he told Defendant "that the district court record was not sufficiently developed to argue ineffective assistance of counsel claims because most if not all of his allegations were based on matters outside the record." (ECF No. 8, PageID.39, ¶ 13.) He states that he "continued to explain this to [Defendant], while at the same time advising him of the availability of a § 2255 proceeding should he be unsuccessful on appeal." (*Id.*, PageID.41, ¶ 23.)

Attorney Jaeger is entirely correct. The Sixth Circuit has noted that "claims of ineffective assistance of counsel are generally disfavored on direct appeal and are more appropriately raised" in a § 2255 motion. *United States v. Wilson*, No. 23-1266, 2024 WL 1198286, at *4 (6th Cir. Feb. 2, 2024). The Sixth Circuit requires that

> so that the litigation may fully develop such that we might be able to see the distinction between an attorney's calculated risk and a true mistake; to help assure that issues are completely developed before we decide them; to avoid putting appellate counsel in the position of relying on the trial counsel for assistance while simultaneously arguing he was deficient (or, worse, to avoid compelling appellate counsel to argue that he, himself, was ineffective in the trial court); and to allow the district court to first decide the factual and legal issues underlying the ineffective assistance claim.

*United States v. Williams*, 527 F. App'x 457, 459 (6th Cir. 2013) (citations omitted).

Had attorney Jaeger raised Defendant's claims regarding ineffective assistance of trial counsel on direct appeal, those claims would have been dismissed without prejudice to Defendant's right to assert them in a § 2255 motion. Accordingly, the Court cannot agree with Defendant that attorney Jaeger was ineffective for failing to raise those claims. Moreover, "defendants are not constitutionally entitled to the assistance of counsel in preparing petitions for certiorari." *Nichols v. United States*, 563 F.3d 240, 242 (6th Cir. 2009) (en banc) (citing *Ross v. Moffitt*, 417 U.S. 600, 617 (1974)). Thus, attorney Jaeger cannot be deemed ineffective for failing to file a petition for certiorari on Defendant's behalf.

Accordingly, for the reasons set forth above, Defendant is not entitled to relief with respect to ground IV.

### B.    Ground III—Challenges to § 922(g)(1)

As his third ground for relief, Defendant contends that his convictions under § 922(g)(1) are unconstitutional because § 922(g)(1) violates the Second Amendment. (§ 2255 Mot., ECF No. 11.) In support of that claim, Defendant relies upon the Supreme Court's recent decision in *New York State Rifle and Pistol Association v. Bruen*, 597 U.S. 1 (2022). Defendant also references *United States v. Prince*, 700 F. Supp. 3d 663 (N.D. Ill. 2023). In his second supplement, Defendant references *United States v. Williams*, 718 F. Supp. 3d 651 (E.D. Mich. 2024). Finally, in his first supplement (ECF No. 19), Defendant relies upon the Supreme Court's decision in *Rehaif v. United States*, 588 U.S. 225 (2019). The Court considers Defendant's various arguments below.

### 1.    *Bruen* Argument

In 2008, the Supreme Court held that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). The Court, however, cautioned that "the right secured by the Second Amendment is not unlimited." *Id.* The *Heller* Court explicitly stated that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* In 2010, the Court affirmed that statement. *See McDonald v. Chicago*, 561 U.S. 742, 786 (2010). Specifically, a plurality of the Court stated: "We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill.'" *Id.* at 786 (quoting *Heller*, 554 U.S. at 626). After *Heller* and *Chicago*, the United States Court of Appeals for the Sixth Circuit "repeatedly found that 'prohibitions on felon possession of firearms do not violate

the Second Amendment.'" *United States v. Goolsby*, No. 21-3087, 2022 WL 670137, at *2 (6th

Cir. Mar. 7, 2022).

Shortly after *Goolsby*, the Supreme Court decided *Bruen*. In *Bruen*, the Court held that

"consistent with *Heller* and *McDonald*, . . . the Second and Fourteenth Amendments protect an

individual's right to carry a handgun for self-defense outside the home." 597 U.S. at 10. The Court

concluded that New York's licensing scheme for issuing public-carry licenses for self-defense

violated the Constitution because licenses issued "only when an applicant demonstrates a special

need for self-defense." *Id.* at 11. In so concluding, the Court stated:

> In keeping with *Heller*, we hold that when the Second Amendment's plain text
> covers an individual's conduct, the Constitution presumptively protects that
> conduct. To justify its regulation, the government may not simply posit that the
> regulation promotes an important interest. Rather, the government must
> demonstrate that the regulation is consistent with this Nation's historical tradition
> of firearm regulation. Only if a firearm regulation is consistent with this Nation's
> historical tradition may a court conclude that the individual's conduct falls outside
> the Second Amendment's "unqualified command."

*Id.* at 17. The government "must affirmatively prove that its firearms regulation is part of the

historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19.

That burden requires the government to point to "'historical precedent' from before, during, and

even after the founding [that] evinces a comparable tradition of regulation." *Id.* at 27.

The *Bruen* Court, however, did reiterate that "the right secured by the Second Amendment

is not unlimited." *Id.* at 21 (quoting *Heller*, 554 U.S. at 626). In concurrences, Chief Justice Roberts

and Justices Alito and Kavanaugh specifically noted that the Court's holding in *Bruen* "decides

nothing about who may lawfully possess a firearm or the requirements that must be met to buy a

gun." *See id.* at 72 (Alito, J., concurring), *see also id.* at 81 (Kavanaugh, J., concurring). The

dissenting justices—Justices Breyer, Kagan, and Sotomayor—also understood the *Bruen*

19

majority's opinion "to cast no doubt" on *Heller*'s treatment of laws prohibiting the possession of firearms by felons. *See id.* at 129 (Breyer, J., dissenting).

In March of 2024, the Sixth Circuit acknowledged that following *Bruen*, there is a circuit split regarding the constitutionality of felon-in-possession convictions under § 922(g)(1). *See United States v. Johnson*, 95 F.4th 404, 416 (6th Cir. 2024). In 2023, the Eighth Circuit held that such convictions do not violate the Second Amendment, writing that "Congress acted within the historical tradition when it enacted § 922(g)(1) and the prohibition on possession of firearms by felons." *United States v. Jackson*, 69 F.4th 495, 505 (8th Cir. 2023). That same year, the Third Circuit sustained a challenge to § 922(g)(1) by a prospective firearm owner who had previously been convicted of making a false statement to obtain federal food stamps. *See Range v. Att'y Gen.*, 60 F.4th 96, 106 (3d Cir. 2023) (en banc). Moreover, the Fifth Circuit sustained a challenge to § 922(g)(1) by an individual who was an unlawful user of a controlled substance. *See United States v. Daniels*, 77 F.4th 337, 355 (5th Cir. 2023).

In *Johnson*, the Sixth Circuit noted that several courts had rejected similar § 922(g)(1) challenges under plain error review. *See Johnson*, 95 F.4th at 416–17 (collecting cases). The *Johnson* court rejected a similar challenge, noting the absence of "precedent explicitly holding that § 922(g)(1) is unconstitutional and because it is unclear that *Bruen* dictates such a result." *Id.* at 417. Subsequently, the Sixth Circuit has twice rejected identical challenges. *See United States v. v. Alvarado*, 95 F.4th 1047, 1053 (6th Cir. 2024); *United States v. Trammell*, No. 23-5221, 2024 WL 3163403, at *5 (6th Cir. June 25, 2024).

The Sixth Circuit has also stated that "we unambiguously held in *United States v. Carey*, 602 F.3d 738, 741 (6th Cir. 2010), that felon-in-possession statutes do not violate the Second Amendment, and that remains the binding law in this circuit." *United States v. Vaughn*, No. 23-

5790, 2023 WL 9789018, at *1 (6th Cir. Sept. 28, 2023). Since *Bruen*, several courts within the Sixth Circuit have rejected § 2255 motions raising the same argument that Defendant raises now. *See, e.g.*, *United States v. Fenderson*, No. 1:19-cr-498, 2024 WL 3046600, at *2 (N.D. Ohio June 18, 2024); *United States v. Purtilo*, No. 1:21-cr-298, 2024 WL 3046347, at *2 (N.D. Ohio June 18, 2024); *United States v. Turner*, No. 18-53-DLB-MAS-1, 2024 WL 2846018, at *4 (E.D. Ky. June 5, 2024); *Penn v. United States*, No. 1:23-cv-114, 2024 WL 872987, at *2 (E.D. Tenn. Feb. 29, 2024).

Moreover, on August 23, 2024, the Sixth Circuit issued a precedential opinion addressing the constitutionality of § 922(g). *See United States v. Williams*, 113 F.4th 637 (6th Cir. 2024). The panel first noted that *Carey* was no longer good law because "the Supreme Court's mode of analysis ha[d] changed since [the Sixth Circuit] last upheld § 922(g)(1)'s constitutionality." *Id.* at 645. The Sixth Circuit noted that, under *Bruen*, the first step is to "ask whether 'the Second Amendment's plain text covers [the defendant's] conduct." *Id.* at 648 (quoting *Bruen*, 597 U.S. at 24). Ultimately, the panel concluded that the phrase "the people," as used in the Second Amendment, encompassed all citizens, including felons. *Id.* at 649. Thus, "[o]n balance, the Second Amendment's plain text presumptively protects William's conduct." *Id.*

The Sixth Circuit then proceeded to the second step under *Bruen*—determining whether the government's burden imposed on the Second Amendment right was "consistent with the principles underpinning our historical tradition of regulating firearms." *Id.* at 650. The panel conducted an exhaustive review of pre-Colonial, Colonial, and post-Colonial history regarding the regulation of firearms and concluded that the burden imposed by § 922(g)(1) was consistent with that history. *See id.* at 650–57. The panel stated that "our nation's history and tradition demonstrate

21

that Congress may disarm individuals they believe are dangerous." *Id.* at 657. Thus, § 922(g)(1) is

"constitutional as it applies to dangerous individuals," *i.e.*, constitutional on its face. *Id.* at 662.

The Sixth Circuit's decision, however, left open the possibility of as-applied challenges to

§ 922(g)(1). The court concluded that "when the legislature disarms on a class-wide basis,

individuals must have a reasonable opportunity to prove that they don't fit in the class-wide

generalization." *Id.* at 661. The panel set forth the following guidance to determine whether an

individual is dangerous:

> A person convicted of a crime is "dangerous," and can thus be disarmed, if he has
> committed (1) a crime "against the body of another human being," including (but
> not limited to) murder, rape, assault, and robbery, or (2) a crime that inherently
> poses a significant threat of danger, including (but not limited to) drug trafficking
> and burglary. An individual in either of those categories will have a very difficult
> time, to say the least, of showing he is not dangerous.
>
> A more difficult category involves crimes that pose no threat of physical danger,
> like mail fraud, tax fraud, or making false statements. But such a case is not before
> us today.

*Id.* at 663. Applying that guidance, the Sixth Circuit concluded that Williams' as-applied challenge

failed, as his prior convictions for aggravated robbery and attempted murder clearly indicated his

dangerousness. *Id.* at 662.

Given the extensive authority set forth above, any facial challenge raised by Defendant to

the constitutionality of § 922(g)(1) fails. Moreover, any intended as-applied challenge also fails.

Defendant's PSR indicates that he has been convicted of aggravated battery, attempted murder,

burglary, domestic violence, and assaulting or obstructing a police officer. *See* PSR, *United States

v. Kaiser*, No. 1:20-cr-170 (W.D. Mich.) (ECF No. 70, PageID.393–396). Under *Williams*, those

convictions certainly qualify Defendant as a "dangerous" individual who can be disarmed. *See

Williams*, 113 F.4th at 663.

As noted *supra*, Defendant also relies upon *United States v. Prince*, 700 F. Supp. 3d 663 (N.D. Ill. 2023), in which that district court concluded that § 922(g)(1) "impose[d] a far greater burden on the right to keep and bear arms than the historical categorical exclusions from the people's Second Amendment right." *Id.* at 673. Defendant also relies upon *United States v. Williams*, 718 F. Supp. 3d 651 (E.D. Mich. 2024), in which that district court concluded that the government had not met its burden under *Bruen* to "identify a historical analog that is 'distinctly similar' or 'relevantly similar' to § 922(g)(1)" and concluded that the statute was unconstitutional as to Williams. *Id.* at 683. Those cases, however, are out-of-district cases that are not binding upon this Court. Moreover, this Court is bound to follow the Sixth Circuit's analysis set forth in *Williams*. Thus, *Prince* and the Eastern District of Michigan's *Williams* case provide Defendant with no basis for relief as well.

## 2. *Rehaif* Argument

In his first supplement, Defendant suggests that the Supreme Court's decision in *Rehaif* renders his conviction void because Defendant did not know that he possessed any firearm at the time of his arrest. (ECF No. 19, PageID.137.) Defendant contends that he did not reside in the residence where the firearm was located at the time of his arrest, and that "[n]ot one shred of evidence" links him to the firearm. (*Id.*)

In *Rehaif*, the Supreme Court held that in a prosecution under 18 U.S.C. § 922(g) and § 924(a)(2), the government must prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm. *Rehaif*, 588 U.S. at 237. *Rehaif* was decided in 2019, before Defendant was indicted and well before his trial, and so the government was on notice that it needed to prove beyond a reasonable doubt that Defendant knew he possessed a firearm and ammunition.

23

Defendant is essentially attempting to relitigate his sufficiency of the evidence claim that he raised on direct appeal. *See Kaiser*, 2022 WL 17547516, at *5–6. The Sixth Circuit rejected that argument, stating:

> For all three counts, we cannot describe the record as "devoid of evidence" that Kaiser possessed the firearms or ammunition. *Raymore*, 965 F.3d at 484 (citation omitted). *First*—the pistol. A rational jury could have concluded that Kaiser had actual possession (that is, "actual and physical control") of this firearm. *Brooks*, 987 F.3d at 601 (citation omitted). No fewer than six eyewitnesses testified that Kaiser brandished a black semiautomatic pistol that closely resembled the recovered pistol introduced at trial. Spinner, one of those many witnesses, added that Kaiser hid the pistol in a "black bandana" when he walked away from their confrontation. Tr., R.85, PageID 597. An officer later found the pistol wrapped in a black bandana in the general area in which Kaiser had headed. Later, Kaiser told his wife to check on his "tools" (what a rational juror could conclude was not-so-subtle code language) underneath the car where the pistol was found. Trial Ex. 25. This amount of evidence is more accurately described as "overwhelming" than "insufficient."
>
> *Second*—the revolver. A rational jury could have found that Kaiser had constructive possession (that is, the power and intent to exercise control) of the revolver on August 13, 2020. *Campbell*, 549 F.3d at 374–75. As an initial matter, significant evidence showed that he had complete access to the Rowe Street home. *See, e.g.*, *United States v. Rich*, 2021 WL 4144059, at *29 (6th Cir. Sept. 13, 2021); *United States v. Workman*, 755 F. App'x 533, 537–38 (6th Cir. 2018); *United States v. Jenkins*, 593 F.3d 480, 484 (6th Cir. 2010). Many witnesses testified that he lived there, and he was seen leaving out the backdoor near where the police found the revolver. While several other people also resided at this home, only "a modicum of additional evidence" was needed to tie Kaiser to the revolver. *United States v. Latimer*, 16 F.4th 222, 227 (6th Cir. 2021). Curtin's testimony showed that he had actually possessed this revolver in the past when he traded drugs for it. Kaiser also later attempted to cajole his wife to change her prior statement that he would "hang out" in the home's backroom where the police found the revolver. Trial Ex. 28.
>
> *Third*—the ammunition. A rational jury could have found that Kaiser had constructive possession of the ammunition found around the Rowe Street house. *See Campbell*, 549 F.3d at 374. Again, the jury could find that he resided at this home. *See Workman*, 755 F. App'x at 537–38; *Jenkins*, 593 F.3d at 484. And again, the jury could find additional evidence connecting him to the ammunition. *Latimer*, 16 F.4th at 227. Much of the ammunition matched the revolver or pistol that the jury could have concluded Kaiser possessed. And much of it was found in a bedroom that the jury could have concluded he occupied. *Cf. id.* at 226; *United States v. Craven*, 478 F.2d 1329, 1333–34 (6th Cir. 1973). It was found near the pieces of mail and prescription bottles that had his name on them. When Kaiser testified, moreover, he conceded that he was wearing the same shoes that were

24

visible in a picture of the bedroom from the time of the search. (Kaiser claimed that these shoes actually belonged to someone else who lived there, but a rational jury was free to disbelieve him.)

* * *

Kaiser next argues that the government presented insufficient evidence to show that he lived at the Rowe Street residence on the date in question. Yet several witnesses tied him to this location. He was also physically present at the home on the date of his arrest, as were items with his name on them. Even during his own testimony, Kaiser repeatedly referred to the Rowe Street residence and the area around it as "my house" and "my alley" before attempting to correct himself by saying "my wife's house" or "my wife's alley." Tr., R.85, PageID 784, 795. It thus did not take a large logical leap for the jury to conclude that he was still predominantly living at this location. *See Workman*, 755 F. App'x at 537–38.

*Kaiser*, 2022 WL 17547516, at *6.

"A § 2255 motion may not be used to relitigate an issue that was raised on appeal absent highly exceptional circumstances." *DuPont v. United States*, 76 F.3d 108, 110 (6th Cir. 1996); *see also Giraldo v. United States*, 54 F.3d 776, 776 (6th Cir. 1995). Defendant has not demonstrated any "highly exceptional circumstances" to warrant relitigation of his sufficiency of the evidence claim. To the extent Defendant believes the Sixth Circuit erred, the proper course of action would have been for Defendant to petition the United States Supreme Court for a writ of certiorari. This Court simply has no authority to review the Sixth Circuit's decision.

In sum, the various challenges Defendant raises to his § 922(g)(1) convictions are wholly without merit. Accordingly, Defendant is not entitled to relief with respect to ground III.

### C.    Ground V—*Erlinger* Claim

Finally, Defendant has supplemented his § 2255 motion with a claim that the sentencing enhancement under the ACCA is now unconstitutional in light of the Supreme Court's recent decision in *Erlinger*. (ECF No. 24, PageID.150.) The government contends that this claim is not cognizable on collateral review. (ECF No. 27.)

25

The ACCA provides that the three previous convictions used as predicate offenses must have been "committed on occasions different from one another." *See* 18 U.S.C. § 924(e)(1). In 2022, the Supreme Court granted certiorari to resolve a circuit split regarding the meaning of the ACCA's "occasions" clause. *See Wooden v. United States*, 595 U.S. 360, 365 (2022). The *Wooden* Court concluded that the inquiry regarding whether the predicate offenses occurred on different occasions is "multi-factored in nature." *See id.* at 369. Notably, the Court stated:

> Timing of course matters, though not in the split-second, elements-based way the Government proposes. Offenses committed close in time, in an uninterrupted course of conduct, will often count as part of one occasion; not so offenses separated by substantial gaps in time or significant intervening events. Proximity of location is also important; the further away crimes take place, the less likely they are components of the same criminal event. And the character and relationship of the offenses may make a difference: The more similar or intertwined the conduct giving rise to the offenses—the more, for example, they share a common scheme or purpose—the more apt they are to compose one occasion.

*Id.* After considering those factors, the Court concluded that Wooden, who had burglarized ten storage units at one storage facility on a single occasion and who pleaded guilty to ten burglary counts, had not committed his offenses on separate occasions and, therefore, was not subject to enhanced sentencing under the ACCA. *Id.* at 375.

Two years later, the Supreme Court revisited the ACCA's "occasions" clause to determine "whether a judge may decide that a defendant's past offenses were committed on separate occasions under a preponderance-of-the-evidence standard, or whether the Fifth and Sixth Amendments require a unanimous jury to make that determination beyond a reasonable doubt." *Erlinger*, 602 U.S. at 825. The Court agreed with Erlinger, concluding that he "was entitled to have a jury resolve ACCA's occasions inquiry unanimously and beyond a reasonable doubt." *Id.* at 835. Thus, after *Erlinger*, a defendant subject to the sentencing enhancements set forth in the ACCA is now entitled to a jury determination concerning whether their prior qualifying felonies occurred on separate occasions.

In its supplemental response, the government acknowledges that *Erlinger* announced a new rule, but that the new rule is procedural, not substantive, and, therefore, cannot apply retroactively to Defendant's case. (ECF No. 27, PageID.164–167.) For the reasons set forth below, the Court agrees with the government.

New rules announced by the Supreme Court apply "only in limited circumstances" to "convictions that are already final." *Schriro v. Summerlin*, 542 U.S. 348, 352 (2004). First, substantive rules generally apply retroactively. *See id.* New substantive rules "include 'rules forbidding criminal punishment of certain primary conduct,' as well as 'rules prohibiting a certain category of punishment for a class of defendants because of their status or offense.'" *Montgomery v. Louisiana*, 577 U.S. 190, 198 (quoting *Penry v. Lynaugh*, 492 U.S. 302, 330 (1989)). In *Montgomery*, the Court defined substantive rules as those that "set forth categorical constitutional guarantees that place certain criminal laws and punishments altogether beyond the State's power to impose." *Id.* at 201. For example, in *Montgomery*, the Supreme Court concluded that the new rule announced in *Miller v. Alabama*—prohibition on imposing mandatory life without parole for juvenile offenders—was a new substantive rule that applied retroactively to cases on collateral review. *Id.* at 206.

New procedural rules, however, "generally do not apply retroactively." *Schriro*, 542 U.S. at 352. New procedural rules include those rules "that regulate only the *manner of determining* the defendant's culpability." *Id.* at 353 (emphasis in original). The Supreme Court has noted that it "give[s] retroactive effect to only a small set of 'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." *Id.* (quoting *Saffle v. Parks*, 494 U.S. 484, 495 (1990)); *see also Teague v. Lane*, 489 U.S. 288, 311 (1989)). It is not enough

that a new procedural rule be "fundamental"; "the rule must be one 'without which the likelihood of an accurate conviction is *seriously* diminished." *Id.* (quoting *Teague*, 489 U.S. at 313).

In light of the foregoing, the Court concludes that the rule announced in *Erlinger* does not amount to a new substantive rule, as the *Erlinger* decision did not "set forth categorical constitutional guarantees that place certain criminal laws and punishments altogether beyond the State's power to impose." *Montgomery*, 577 U.S. at 201. Instead, the rule announced in *Erlinger* only alters "the manner of determining the defendant's culpability." *Edwards v. Vannoy*, 593 U.S. 255, 276 (2021); *see also Erlinger*, 602 U.S. at 859 n.3 (Kavanaugh, J., dissenting) ("For any case that is already final, the *Teague* rule will presumably bar the defendant from raising [*Erlinger*'s] new rule in collateral proceedings.").

Moreover, the Court cannot conclude that the rule announced in *Erlinger* amounts to a "watershed rule of criminal procedure" that should be given retroactive effect to cases on collateral review. Notably, the Supreme Court "has identified only one pre-*Teague* procedural rule as watershed: the right to counsel recognized in the Court's landmark decision in *Gideon v. Wainwright*, 372 U.S. 335 . . . (1963)." *Vannoy*, 593 U.S. at 267. The *Vannoy* Court noted that it "has never identified any other pre-*Teague* or post-*Teague* rule as watershed. None." *Id.* The majority noted that if "landmark and historical criminal procedure decisions" do not apply retroactively on collateral review, the Court could not "responsibly continue to suggest" to litigants and other courts that any "new rules of criminal procedure can satisfy the watershed exception." *Id.* at 271. The Court forcefully stated: "It is time—probably long past time—to make explicit what has become increasingly apparent to bench and bar over the last 32 years: New procedural rules do not apply retroactively on federal collateral review. The watershed exception is moribund.

It must 'be regarded as retaining no vitality.'" *Id.* at 272 (quoting *Herrera v. Wyoming*, 587 U.S. 329, 342 (2019)).

 In light of the Supreme Court's dicta in *Vannoy*, this Court agrees with the handful of other courts that have concluded that *Erlinger* did not announce a new rule that is retroactively applicable on collateral review. *See, e.g.*, *Stackhouse v. United States*, Nos. 8:15-cr-177-VMC-TGW, 8:18-cv-772-VMC-TGW, 2024 WL 5047342, at *8 (M.D. Fla. Dec. 9, 2024); *Grant v. United States*, No. 8:24-cv-02029-WFJ-CPT, 2024 WL 4729193, at *3–4 (M.D. Fla. Nov. 8, 2024); *Goff v. United States*, No. 3:22-cv-00215, 2024 WL 4701882, at *7 (M.D. Tenn. Nov. 6, 2024); *Ursery v. United States*, No. 3:22-cv-00776, 2024 WL 4652209, at *4 (M.D. Tenn. Nov. 1, 2024); *United States v. Casares-Cuevas*, No. 3:12-cr-00038-HDM-VPC, 2024 WL 4216017, at *2 (D. Nev. Sept. 17, 2024); *McAdams v. United States*, No. 23-cv-04081-ESK, 2024 WL 4100368, at *4 (D.N.J. Sept. 6, 2024). Instead, the rule announced in *Erlinger* "merely 'allocate[d] decision making authority' by requiring a jury rather than a judge' to make certain factual determinations." *Ursery*, 2024 WL 4652209, at *4 (quoting *Duncan v. United States*, 553 F.3d 442, 447 (6th Cir. 2009). As the Sixth Circuit noted in *Duncan*, courts have not made any indication that "juries [are] so much more accurate than judges such that the change brought about by [*Erlinger*'s new rule] 'implicate[s] the fundamental fairness and accuracy of the criminal proceeding.'" *Duncan*, 553 F.3d at 447 (quoting *Schriro*, 542 U.S. at 353).

 In light of the foregoing, this Court concludes that while *Erlinger* announced a new rule, this new rule does not apply retroactively to cases on collateral review. Defendant, therefore, cannot rely upon *Erlinger* to challenge his sentencing enhancement under the ACCA. Defendant, therefore, is not entitled to relief with respect to habeas ground V.

In sum, Defendant has failed to demonstrate that any of his grounds for relief are meritorious. Defendant, therefore, is not entitled to relief on his § 2255 motion. Furthermore, because the record conclusively establishes that Defendant is not entitled to relief, there is no need for the Court to conduct an evidentiary hearing.

## IV.    Certificate of Appealability

Under 28 U.S.C. § 2253(c)(1)(B), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Defendant has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined Defendant's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists of reason could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Defendant's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Defendant's claims was debatable or wrong. Therefore, the Court will deny Defendant a certificate of appealability. Moreover, although Defendant has failed to demonstrate that he is in custody in

violation of the Constitution and has failed to make a substantial showing of the denial of a constitutional right, the Court does not conclude that any issue Defendant might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## V.    Conclusion

For the foregoing reasons, the Court will deny Defendant's § 2255 motion. Accordingly,

**IT IS ORDERED** that Defendant's motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255 (ECF No. 1) is **DENIED**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.

A separate judgment will follow. *See Gillis v. United States*, 729 F.3d 641, 643 (6th Cir. 2013) (requiring a separate judgment in habeas proceedings).

Dated:  January 28, 2025                     /s/ Paul L. Maloney
                                             Paul L. Maloney
                                             United States District Judge